**BEAR VALLEY MUTUAL WATER COMPANY, a corporation, Plaintiff,**

v.

**R. A. RIDDELL, District Director of Internal Revenue, Defendant.**

No. 64–1499.

United States District Court
C. D. California.

April 22, 1968.

Thomas H. McPeters and Surr & Hell-yer, San Bernardino, Cal., for plaintiff.

Wm. Matthew Byrne, Jr., U. S. Atty., Loyal E. Keir, Asst. U. S. Atty., Chief, Tax Division, Robert T. Jones, Asst. U. S. Atty., for defendant.

### DECISION, FINDINGS OF FACT, and CONCLUSIONS OF LAW

HAUK, District Judge.

This is an action in three counts brought against the United States District Director of Internal Revenue, Los Angeles District, by a non-profit mutual water company for refund of a total of approximately $31,000 in Federal corporate income taxes which, it is alleged, were erroneously and illegally assessed, collected by the Government and overpaid by the taxpayer water company for the three fiscal years ending October 31 of 1958, 1959 and 1960. Jurisdiction is vested in the Court by virtue of 28 U.S. C.A. §§ 1340 [1] and 1346(a) (1).[2] Venue is properly laid in this Court under the provisions of 28 U.S.C.A. § 1402 [3] since plaintiff filed the appropriate and timely claims for refund required by 26 U.S. C.A. § 7422.[4]

1. 28 U.S.C.A. § 1340:
"§ 1340. Internal revenue; customs duties
The district courts shall have original jurisdiction of any civil action arising under any Act of Congress providing for internal revenue, or revenue from imports or tonnage except matters within the jurisdiction of the Customs Court."

2. 28 U.S.C.A. § 1346(a) (1):
"§ 1346. United States as defendant
(a) The district courts shall have original jurisdiction, concurrent with the Court of Claims, of:
(1) Any civil action against the United States for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws;"

3. 28 U.S.C.A. § 1402:
"§ 1402. United States as defendant
(a) Any civil action against the United States under subsection (a) of section 1346 of this title may be prosecuted only:
(1) Except as provided in paragraph (2), in the judicial district where the plaintiff resides;
(2) In the case of a civil action by a corporation under paragraph (1) of sub-section (a) of section 1346, in the judicial district in which is located the principal place of business or principal office or agency of the corporation; or if it has no principal place of business or principal office or agency in any judicial district (A) in the judicial district in which is located the office to which was made the return of the tax in respect of which the claim is made, or (B) if no return was made, in the judicial district in which lies the District of Columbia. Notwithstanding the foregoing provisions of this paragraph a district court, for the convenience of the parties and witnesses, in the interest of justice, may transfer any such action to any other district or division.
(b) Any civil action on a tort claim against the United States under subsection (b) of section 1346 of this title may be prosecuted only in the judicial district where the plaintiff resides or wherein the act or omission complained of occurred."

4. 26 U.S.C.A. § 7422:
"§ 7422. Civil actions for refund
(a) No suit prior to filing claim for refund.—No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have

The Government resists the action on three alternative theories: (1) that the water company received taxable income equivalent to the difference between the

been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed with the Secretary or his delegate, according to the provisions of law in that regard, and the regulations of the Secretary or his delegate established in pursuance thereof.

(b) Protest or duress.—Such suit or proceeding may be maintained whether or not such tax, penalty, or sum has been paid under protest or duress.

(c) Suits against collection officer a bar.—A suit against any officer or employee of the United States (or former officer or employee) or his personal representative for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected shall be treated as if the United States had been a party to such suit in applying the doctrine of res judicata in all suits instituted after June 15, 1942, in respect of any internal revenue tax, and in all proceedings in the Tax Court and on review of decisions of the Tax Court where the petition to the Tax Court was filed after such date.

(d) Credit treated as payment.—The credit of an overpayment of any tax in satisfaction of any tax liability shall, for the purpose of any suit for refund of such tax liability so satisfied, be deemed to be a payment in respect of such tax liability at the time such credit is allowed.

(e) Stay of proceedings.—If the Secretary or his delegate prior to the hearing of a suit brought by a taxpayer in a district court or the Court of Claims for the recovery of any income tax, estate tax, or gift tax (or any penalty relating to such taxes) mails to the taxpayer a notice that a deficiency has been determined in respect of the tax which is the subject matter of taxpayer's suit, the proceedings in taxpayer's suit shall be stayed during the period of time in which the taxpayer may file a petition with the Tax Court for a redetermination of the asserted deficiency, and for 60 days thereafter. If the taxpayer files a petition with the Tax Court, the district court or the Court of Claims, as the case may be, shall lose jurisdiction of taxpayer's suit to whatever extent jurisdiction is acquired by the Tax Court of the subject matter of taxpayer's suit for re-

fund. If the taxpayer does not file a petition with the Tax Court for a redetermination of the asserted deficiency, the United States may counterclaim in the taxpayer's suit, or intervene in the event of a suit as described in subsection (c) (relating to suits against officers or employees of the United States), within the period of the stay of proceedings notwithstanding that the time for such pleading may have otherwise expired. The taxpayer shall have the burden of proof with respect to the issues raised by such counterclaim or intervention of the United States except as to the issue of whether the taxpayer has been guilty of fraud with intent to evade tax. This subsection shall not apply to a suit by a taxpayer which, prior to the date of enactment of this title, is commenced, instituted, or pending in a district court or the Court of Claims for the recovery of any income tax, estate tax, or gift tax (or any penalty relating to such taxes).

(f) Limitation on right of action for refund.—

(1) General rule.—A suit or proceeding referred to in subsection (a) may be maintained only against the United States and not against any officer or employee of the United States (or former officer or employee) or his personal representative. Such suit or proceeding may be maintained against the United States notwithstanding the provisions of section 2502 of title 28 of the United States Code (relating to aliens' privilege to sue).

(2) Misjoinder and change of venue.— If a suit or proceeding brought in a United States district court against an officer or employee of the United States (or former officer or employee) or his personal representative is improperly brought solely by virtue of paragraph (1), the court shall order, upon such terms as are just, that the pleadings be amended to substitute the United States as a party for such officer or employee as of the time such action commenced, upon proper service of process on the United States. Such suit or proceeding shall upon request by the United States be transferred to the district or division where it should have been brought if such action initially had been brought against the United States.

(g) Cross references.—

(1) For provisions relating generally to claims for refund or credit, see chapter 65 (relating to abatements, credit, and refund), and chapter 66 (relating to limitations).

cost or fair market value of the water distributed to shareholders and the price charged therefor (which was nothing); (2) that the water company received taxable income because the costs and expenses of the water company incurred in providing water to shareholders without charge to them was not deductible; or (3) that all the amounts paid by shareholders as "assessments" should be included in taxable income.

After a one-day trial upon extensive evidence introduced almost entirely by stipulation and supplemented by the relatively short oral testimony of the secretary-treasurer of the water company, the Court took the matter under submission. Now, having considered all of the evidence, both oral and documentary, the contentions and arguments of the parties and the respective points and authorities relied upon by them, the Court makes its Decision, Findings of Fact and Conclusions of Law.

## DECISION

Bear Valley Mutual Water Company (hereinafter "water company") seeks a refund of income taxes collected from it as follows:

| Taxable Period | Tax | Interest | Total |
|---|---|---|---|
| Fiscal Year Ending: | | | |
| October 31, 1958 | $11,064.15 | $2,151.29 | $13,215.44 |
| October 31, 1959 | 6,759.85 | 908.78 | 7,668.63 |
| October 31, 1960 | 10,205.86 | 759.71 | 10,965.57 |

The controversy arises from the water company's long standing practice of distributing water to its shareholders without charge, except for assessments levied from time to time with respect to each issued and outstanding share of stock. The costs and expenses of gathering, impounding and distributing the water are considerable, but revenue derived from land sales, leases, boat rentals, interest, assessments and other miscellaneous sources has been sufficient to defray the costs and expenses, thus permitting the water company to maintain the practice of distributing water to its shareholders without charge except for assessments. The Government proposes to tax the water company upon the value of the benefit resulting to its shareholders, and upon the assessment paid to it by the shareholders.

### Government's First Contention

It is contended that the water company realizes income each year in an amount equal to the difference between the fair market value of the water distributed and the amount received by it from its shareholders for the water. The difficulty with the proposition is that it would require the water company to pay tax upon income that it does not receive and is not entitled to receive.

The proposition is, nevertheless, said to be established by the concurring opinion of Judge Withey in Anaheim Union Water Co. v. C.I.R., 35 T.C. 1072, 1081 (1961), Chicago and Western Indiana Railroad Co. v. C.I.R., 303 F.2d 796 (7th Cir. 1962) and Eastern Carbon Black Co. v. Brast, 104 F.2d 460 (4th Cir. 1939). Upon analysis, only the concurring opin-

(2) For duty of United States attorneys to defend suits, see section 507 of Title 28 of the United States Code.

(3) For jurisdiction of United States District Courts, see section 1346 of Title 28 of the United States Code.

(4) For payment by the Treasury of judgments against internal revenue officers or employees, upon certificate of probable cause, see section 2006 of Title 28 of the United States Code."

ion of Judge Withey supports the proposition.

We find no support in Chicago & Western Indiana Railroad Co. v. C.I.R., supra. That case involved only a determination of the obligations of shareholders to a corporation under agreements dated 1882 and 1947. Once it was determined that the shareholders were *obligated* to pay the full cost of furnishing the services and facilities and, therefore, that the corporation was *entitled* to receive that amount from the shareholders, all that remained to be done was application to the established facts of an elementary principle of tax accounting, i. e., under an accrual method of accounting, income is includible in gross income when all the events have occurred which fix the right to receive such income and the amount thereof can be determined with reasonable accuracy. I.R.C.1954, § 451, Treasury Regulations, § 1.451–1. The Court itself expressed it this way (303 F.2d p. 802):

> "We have held that these undisputed amounts credited to the shareholders were improperly omitted from income because absent such credits these amounts were *otherwise payable by the shareholders* pursuant to their various leases and thus reflected income which legally accrued to taxpayer."

That case with respect to this issue was factually novel but legally commonplace.

Likewise, there is nothing in Eastern Carbon Black Co. v. Brast, supra, that supports the proposition. The corporation was a manufacturer of carbon black. The stock was owned by two companies. Sales of the corporation were controlled by one of the stockholders and production by the other. The shareholder in control of sales caused a contract to be entered into between the corporation and himself requiring the corporation to deliver carbon black to him for a period of six years at the price of five cents per pound.

During the period of the contract, the market price of carbon black greatly increased, reaching at one point eleven cents per pound. Even though the market price greatly increased, the shareholder continued to take carbon black at the contract price and, in addition, took a substantial number of pounds at the contract price over and above the amount specified in the contract.

The other stockholder complained that marketplace sales would produce greater revenue for the corporation. The two stockholders reached agreement as follows: (1) that the stockholder would pay $50,000 to the other non-purchasing shareholder, (2) that present inventory and all future production would be sold equally to the two shareholders at four cents per pound and (3) that any outstanding contracts of sale would be assigned to the non-purchasing shareholder who would fulfill the contracts and account to the purchasing shareholder for one-half of the profit realized from fulfilling the contracts.

It was agreed later that the carbon black would be charged to the two shareholders at six cents per pound rather than four cents per pound. When it came time to file tax returns, however, the books were changed to reflect four cents per pound.

The $50,000 was paid to the non-purchasing shareholder, the change in price of carbon from four cents to six cents per pound created a receivable on the books of the corporation of $109,575 and a profit was made in fulfilling the contracts assigned of $24,161.42. The Internal Revenue Service added all three of these items to the income of the corporation.

With respect to adding the $50,000 to the income of the corporation, the Court noted that the claim which was the basis of the payment was the claim of the corporation and concluded that what was received by the shareholder "was in reality money belonging to taxpayer, and that its taxability as income of that corporation was not affected by the fact that it was paid directly to the stockholders aggrieved instead of to the corporation to be disbursed to them by way of dividends". (104 F.2d p. 463).

Then, with respect to the profit made on fulfilling the assigned contracts, the Court stated (p. 464):

"These contracts were property of the taxpayer. It had the carbon black with which to fill them. When it sold this carbon black to Davis Brothers at cost and assigned to them the contracts with an agreement that the profits realized should be divided with the other stockholder, it simply transferred to stockholders *the right to receive income to which it was entitled* * * *." (Emphasis added.)

Finally, with respect to the $109,575 added to income (and representing the difference between four cents and six cents a pound for carbon black delivered to the shareholders), the Court noted that "no reason appears for reducing the price to four cents when the five cent price had been the cause of controversy as being too low; and, that *the price was to be cost and that the cost was around six cents* * * *" (p. 462, emphasis added.) The Court further noted that the book entries reflecting a charge of six cents per pound were changed to reflect four cents per pound at the same time the shareholders agreed that the tax return of the corporation should be filed upon the basis of four cents per pound. (p. 462). After finding these salient facts, the Court concluded (p. 464):

"With respect to the $109,575 item, arrived at by adding two cents per pound to the carbon black sold the Morrill Company and Davis Brothers during the year 1919, it appears that the market price was far in excess of the price of six cents resulting, and that the commissioner adopted the six cent figure *because of the understanding that the real price should be cost of production which was six cents.* We do not think taxpayer is in position to complain of this. In the case of ordinary sales, there is no point in distinguishing between market value and sale price; but, where there is a sale to stockholders below market value, this is in effect a distribution among stockholders and the price obtained is not determinative in computing income, a part of which is thus distributed. The carbon black delivered to the stockholders here was worth more than six cents a pound in the hands of the corporation. When it charged the stockholders less than that amount for it, it was not in reality reducing its income but giving a part of that income to the stockholders. The real income of the corporation can no more be affected by such a transaction, we think, than by the payment of exorbitant salaries; and the existence of a formal contract constitutes no more justification for ignoring the real income in the one case than in the other". (Emphasis added.)

Summarizing its opinion, the Court stated (p. 464):

"The conclusion at which we have arrived is based, not on the fact that there was an intent on the part of the parties concerned to evade taxes, but on the fact that, when regard is had to substance and not form, the income involved was in reality the income of taxpayer."

The corporation was, therefore, held to be entitled to the income and, thus, to be properly taxed upon it.

There is nothing in *Chicago & Western Indiana Railroad Co.* and *Eastern Carbon Black Co.* that would require or permit taxation of income in the absence of a right to receive that income. The crucial determination in each of those cases was that a right to receive the income existed. Once that determination was made, taxation of the income became inevitable. Every taxpayer, whether on a cash basis or an accrual basis, is taxed upon his income.

The concurring opinion of Judge Withey in Anaheim Union Water Co. v. C.I.R., 35 T.C. 1072, 1081 (1961) is to the contrary, and squarely supports the proposition advanced by the government. The concurring opinion reads in full (p. 1081):

"Petitioner is taxable on the oil royalties and rentals because, in substance, they or the water into which

they were converted are clearly surplus after the conversion which was distributed to petitioner's stockholder customers at an amount less than the water's value exactly corresponding to such royalties and rentals. In substance then the royalties and rentals were so distributed as dividends. As stated, such dividends were paid from a water surplus. For illustration, it is considered that a gallon of water reaches petitioner's headgate in the river. At that point it has no intrinsic value to petitioner for it then must be taken, stored and delivered and the facilities to do so maintained. By the application of its oil royalties and rentals to that processing, the gallon of water immediately upon being taken from the river begins to acquire value to the extent such royalties, rentals and the rate paid by the customer are applied to its processing. At the point where the gallon of water is about to be turned over to the customer it is worth at least the cost of bringing it to that point—for the sake of discussion let us say 10 cents. One cent of the cost is paid by the stockholder customer and 9 cents defrayed from royalties and rentals. The 9 cents thus distributed is then in substance clear surplus in petitioner's hands and a distribution by way of a dividend to such customers. The surplus is taxable business net income".

However, such a view of taxation—that a taxpayer must pay tax upon income he does not receive and is not entitled to receive—is as unconscionable as it is unsupportable.

When read as a whole, the opinion in Anaheim Union Water Co. v. C.I.R., 321 F.2d 253 (9th Cir. 1963), expresses disapproval of the view expressed by Judge Withey. Essentially, the Court refused to create constructive income equal to the difference between the fair market value of the water distributed and the amount paid for it by the shareholders, for the reason that the company was not entitled to receive any amount for the water in excess of the amount actually received in accordance with the unit price and quantity distributions determined by the board of directors.

Bear Valley Mutual Water Company—like Anaheim Union Water Company—is a mutual water company not organized and operated for profit. Its shareholders are not obligated to pay any amount for the water distributed to them in excess of the amount due in accordance with the unit price and quantity distributions determined by the board of directors. It is not required to charge its shareholders the actual costs and expenses of gathering, impounding and distributing the water each year. To do so would result in a profit in derogation of its articles of incorporation and by-laws. Rather, it is entitled and obligated to pool its income and expenses from all sources in an effort to supply water to its shareholders at the lowest possible cost. This is, and has been historically, the prevailing and accepted mode of operation for a mutual water company.

The references to the operation of the water company as constituting a "scheme of tax avoidance" and a "sham" are wholly inappropriate as well as inaccurate. The water company was established more than a decade prior to the enactment of the Revenue Act of 1916 and, as previously stated, its mode of operation is, and has been historically, the prevailing and accepted mode of operation for a mutual water company.

 The contention that the water company realizes income each year in an amount equal to the difference between the fair market value of the water distributed and the amount received by it from its shareholders for the water must be rejected. The water company cannot be taxed upon income it did not receive and was not entitled to receive from the shareholders.

*Government's Second Contention*

 It is next contended that the costs and expenses of the water company in gathering, impounding and distribut-

ing water to its shareholders—to the extent the costs exceed the amount paid by the shareholdes for the water—are not deductible as ordinary and necessary expenses of conducting a business. Consideration of this contention is foreclosed by Anaheim Union Water Co. v. C. I. R., 321 F.2d 253 (9th Cir. 1963), which holds squarely to the contrary, and we will not further discuss it.

### Government's Third Contention

As an alternative to its two primary contentions and wholly unrelated to them from a legal standpoint, the Government contends that the "assessment" paid by each shareholder constitutes a "water charge" and thus, the aggregate amount paid by the shareholders in any year is includable in the gross income of the water company. The water company denies that the assessment is a water charge, but rather is a "contribution to capital" and thus, maintains that the aggregate amount paid by the shareholders is wholly excludable from its gross income.

Upon the facts and circumstances here presented, we determine that part of the amount paid by each shareholder is a water charge and part is a contribution to capital.

Section 118(a) of the Internal Revenue Code of 1954, which has no predecessor in prior statutory tax law, provides:

"General rule—In the case of a corporation, gross income does not include any contribution to the capital of the taxpayer."

Treasury Regulation § 1.118–1 states in pertinent part that:

"the exclusion does not apply to any money or property transferred to the corporation in consideration for goods or services rendered * * *."

The question, then, is whether the assessments paid by the shareholders are really payments for the water distributed to them when regard is had to substance and not to form.

A California corporation may levy assessments with respect to its capital stock if its right to do so is expressly reserved in its articles of incorporation. Calif.Corp.Code, § 305.[5] Shares of stock are not assessable unless the corporation reserves the right to levy them in its articles of incorporation. Calif.Corp.Code, § 2700.[6] Assessments constitute liens upon the shares with respect to which they are levied. Calif.Corp.Code, § 2704.[7] Failure to pay an assessment results in a sale or forfeiture of the shares subject to the unpaid assessment, or al-

---

5. Calif.Corp.Code § 305:
 "§ 305. Articles of incorporation; permissible provisions. The articles may include any desired provisions:
 (a) Granting, with or without limitations, the power to levy assessments upon the shares or any class of shares.
 (b) Granting to shareholders preemptive rights to subscribe to any or all issues of shares or securities.
 (c) Imposing any limitations and requirements authorized by this division, and otherwise regulating the business and affairs of the corporation and the powers of the directors and shareholders in a manner not in conflict with law."

6. Calif.Corp.Code § 2700:
 "§ 2700. Authority to levy assessments; articles. Shares issued by stock corporations are not assessable except as provided in this chapter. If the articles expressly confer such authority upon the

corporation or the board of directors, and subject to any limitations therein contained, the directors may in their discretion levy and collect assessments upon all shares of any or all classes made subject to assessment by the articles. This authority is additional to that of making calls for the unpaid subscription price of shares."

7. Calif.Corp.Code § 2704:
 "§ 2704. Lien for assessment; waiver by transfer on books. The assessment is a lien upon the shares assessed from the time of personal service or the publication of the notice of assessment, unless the articles or by-laws provide for such lien from the time of the resolution levying the assessment. A transfer of the shares on the books after the lien of an assessment has attached is a waiver of the lien."

ternatively, in case of corporations whose articles of incorporation reserved the right to do so on August 21, 1933, personal liability for the amount of the assessment. Calif.Corp.Code §§ 2707,[8] 2708,[9] and 2714.[10] A shareholder may redeem his shares after delinquency and before sale upon payment of a 5 percent penalty in addition to payment of the amount of the assessment. Calif.Corp. Code, § 2706.[11]

An assessment is levied by resolution of the board of directors. Calif.Corp. Code, § 2701.[12] The Secretary of the corpoation must provide the shareholders with notice of the assessment, the delinquency date, the place, date and hour of sale of delinquent shares, and the place where and the date by which the assessment must be paid in order to avoid delinquency. Calif.Corp.Code, §§ 2702 [13] and 2703.[14] The purpose of the assess-

8. Calif.Corp.Code § 2707:
"§ 2707. Sale; highest bidder; transfer of shares; issuance of new certificate. At the place and time appointed in the notice of levy and sale, the secretary, assistant secretary, or any officer or an attorney of the corporation, shall, unless otherwise ordered by the directors, sell or cause to be sold to the highest bidder for cash as many shares of each delinquent holder of the assessed shares of stock as may be necessary to pay the assessment and charges thereon according to the notice.

The person offering at the sale to pay the assessment and penalty for the smallest number of shares is the highest bidder. The shares purchased shall be transferred to him on the share register of the corporation on the payment of the assessment and penalty and a new certificate therefor issued to him.

A corporation is not required to accept an offer for a fraction of a share."

9. Calif.Corp.Code § 2708:
"§ 2708. Forfeiture of shares; insufficient bid. If no bidder offers to pay the amount due on the shares, together with the penalty of 5 percent thereof, the shares shall be forfeited to the corporation in satisfaction of the assessment and penalty thereon."

10. Calif.Corp.Code § 2714:
"§ 2714. Remedies for collection of assessment. The only remedy for the collection of an assessment on fully paid shares is sale or forfeiture of the shares unless (a) the remedy by action is expressly authorized in the original articles or by an amendment of the articles adopted before August 21, 1933, or by an amendment adopted on or after August 21, 1933, by unanimous consent of the shareholders, and (b) unless a statement of such remedy appears on the face of any share certificate issued on or after August 21, 1933."

11. Calif.Corp.Code § 2706:
"§ 2706. Redemption before sale; penalty. If payment is made after delinquency and before the sale, the share-

holder shall pay a penalty of 5 percent of the amount of the assessment on the shares in addition to the assessment."

12. Calif.Corp.Code § 2701:
"§ 2701. Contents of resolution levying assessment. Every resolution of a stock corporation levying an assessment shall specify the amount thereof, to whom and where payable; fix a day on which the unpaid assessments become delinquent, not less than 30 nor more than 60 days from the date of passing the resolution levying the assessment; and fix a day for the sale of delinquent shares not less than 15 nor more than 60 days from the date on which .the shares become delinquent. The resolution also shall fix the hour and place of sale, which place shall be in the county where the principal office of the corporation is located."

13. Calif.Corp.Code § 2702:
"§ 2702. Notice of levy; form. Upon the passing of the resolution levying an assessment by a stock corporation, the secretary of the corporation shall give notice thereof in substantially the following form:
(Name of corporation in full. Location of principal office.)
Notice is hereby given that at a meeting of the board of directors held on the (date) an assessment of (amount) per share was levied upon the shares of the corporation payable (to whom and where). Any shares upon which this assessment remains unpaid on the (day fixed) will be delinquent, and unless payment is made prior to delinquency the said shares, or as many of them as may be necessary, will be sold at the (particular place) on the (date) at (the hour) of such day, to pay the delinquent assessment, together with a penalty of 5 percent of the amount of the assessment on such shares, or be forfeited to the corporation. (Name of secretary with location of office.)"

14. Calif.Corp.Code § 2703:
"§ 2703. Service of notice. The notice shall be served upon each shareholder personally. In lieu of personal service

ment is not required to be stated, however.

Here, the water company is expressly empowered by its articles of incorporation to levy assessments and has done so in every year since 1906 with the exception of 1908. The revenue from assessments is not segregated or otherwise specially accounted for. Revenue from assessments is commingled with revenue from other sources and indiscriminately applied to the needs of the business, including expenditures for capital additions as well as operating costs and expenses.

The shareholders are entitled to a certain amount of water for each share owned by them as determined from time to time by the board of directors. No charge is made for water distributed in accordance with the share allotments. No shareholder is entitled to receive more than his allotted share of water based upon his share ownership.

Assessments are levied without regard to the amount of water actually used by a shareholder. The assessment is levied with regard to each issued and outstanding share and each share is assessed an identical amount.

Although revenue from assessments is commingled with revenue from non-shareholder sources as we have indicated, the intention of the board of directors when levying an assessment is twofold: first, to provide revenue to offset the deficit for the year in operating expenses (after there has first been applied to the operating expenses for the year all revenue from non-shareholder sources); and second, to make capital expenditures. It is clear, therefore, that a portion of each assessment levied is intended to be a contribution to the capital of the water company and that the water company makes substantial capital expenditures each year.

The Government argues that the revenue from assessments should be included in the water company's gross income since the revenue is received by it free of restriction regarding use and is commingled with revenue from non-shareholder sources, even though the board of directors intended a portion of the assessment to be used to make capital expenditures and even though substantial capital expenditures are actually made during the year. This argument is inconsistent with positions successfully advanced by the Government in other cases involving mutual water companies and the deductibility of assessments by shareholders wherein the courts have, at the urging of the Government, held that the shareholders could not deduct the assessments because they were contributions to capital and not ordinary business expenses.

In United States v. Akin, 248 F.2d 742 (10th Cir. 1957), the Court stated the question and operative facts as follows (p. 743):

"The question presented for determination is whether portions of annual assessments paid by taxpayers who were farmers to two mutual ditch companies which supplied water for the irrigating of the farms of the taxpayers and were used by such companies to retire long term indebtedness and to purchase a right of way were deductible from gross income of the taxpayers as ordinary and necessary expenses incurred in carrying on their farming businesses.

"The taxpayers were engaged in the business of farming in Colorado, and

the notice may be sent through the mail addressed to each shareholder at his last address, as it appears on the books of the corporation, or if it does not appear, at the place where the principal office of the corporation is located, and published once in some newspaper of general circulation published in the city or town of the principal office of the corporation. If there is no such newspaper published in the city of the principal office of the corporation, the publication shall be made in some such newspaper of the county if there is one, or if there is none then in some such newspaper published in an adjoining county. Such personal service or service by mail and publication shall be made at least 10 days prior to the date of delinquency."

they obtained water for the irrigating of their farm lands from two mutual ditch companies. The ditch companies were corporations organized under the laws of Colorado, and they distributed water to farmers who used it for the growing of agricultural crops. In order for a water right owner to be entitled to receive water distributed by the companies, it was necessary that he have stock in the company with all assessments paid. If a stockholder defaulted in the payment of an assessment, interest was charged; and if he remained in default after notice and demand for payment, his stock could be sold at public auction. During the years 1949 and 1950, each company made an assessment pro rata upon all of its stock issued and outstanding. Each assessment of one company contained an item for the retirement pro tanto of a long term indebtedness, an item for the payment of interest on the outstanding indebtedness, and an item for the purchase of a right of way; and each assessment of the other company contained an item for the retirement in part of a long term indebtedness, and an item for the payment of interest on such indebtedness. The taxpayers paid the respective annual assessments levied upon them by one or both of the companies and deducted the amounts thereof from their gross income as ordinary and necessary business expenses incurred in the operation of their farming businesses. The Commissioner of Internal Revenue disallowed the portions of the deductions attributable to the items referred to."

The Court noted that the value of the stock was in the water rights which it represented, but that nevertheless the shareholders each owned a pro rata share of such equity as existed, and then stated (pp. 744–745):

"But in each instance here, the ditch company was the only one liable upon the outstanding indebtedness for the retirement of which a portion of the amounts paid by the taxpayers to the ditch company was to be used. The taxpayers were not personally liable for any portion of the indebtedness. And the intended purpose and resulting effect of the payments made by the taxpayers to the ditch companies for use in the retirement pro tanto of the principal together with the accrued interest thereon was to strengthen the financial position of the ditch companies by reducing their long-term obligations. In respect to federal revenue legislation, the payments of assessments for such purpose fell within the range of capital contributions to the ditch companies, respectively, rather than ordinary and necessary expenses incurred in carrying on the businesses of the taxpayers. Compare, 50 East 75th Street Corp. v. Commissioner [of Internal Revenue], 2 Cir., 78 F.2d 158. The legal title to the right of way acquired with the proceeds of the assessments for that purpose was taken in the name of the ditch company. And the purpose in acquiring and taking legal title to the right of way was to expand the distribution system by creating an addition to it. Again, the payments of the assessments for that purpose constituted capital contributions, not ordinary and necessary expenses incurred by the taxpayers in carrying on their businesses. Compare, Cripple Creek Coal Co. v. Commissioner, 7 Cir., 63 F.2d 829."

In Hunter v. C. I. R., 46 T.C. 477 (1966), the taxpayer argued that stock assessments paid by him constituted a "service charge" for the rendition of a service essential to the carrying on of his business of irrigated farming and, therefore, the annual assessment was deductible in full as an ordinary and necessary business expense. The Tax Court replied (pp. 483–484):

"Undoubtedly the water furnished to petitioner's farm was essential to his operations. However, we cannot con-

strue the water assessment in dispute as a 'service charge' similar to that which a supplier of utilities would ordinarily charge a customer. The expenditure in controversy is the portion of the assessment which Highland used to repay the bank for the money which it borrowed to build a new dam for its stockholders, and to pay for stock in the bank that Highland was required to purchase in order to borrow the money. If Highland for some reason could not meet the water requirements of its members, we believe that the petitioner and the other stockholders would, nevertheless, be obliged to pay their full annual assessment to Highland, including a pro rata share of the amount required to be paid on the indebtedness and the stock. Petitioner was paying for more than an allotment of water; he acquired a stockholder's equitable interest in a new diversion dam and shares of the capital stock of a bank, title to which was vested in Highland, which were capital assets in the hands of Highland; and he was enhancing the value of his stock in Highland by reducing the long-term indebtedness of that company."

If the Government takes the position, and it is clear from the cases that it must and in fact does, that a shareholder cannot deduct that portion of an assessment used by the recipient mutual water company to make capital expenditures, upon the ground that such portion is not a water charge but the shareholder's non-deductible contribution to capital, it must follow that the same portion of the assessment is excludable from the gross income of the recipient mutual water company. The Government cannot be heard to complain of the logical extension of its own position vis-a-vis the shareholder to the other party to the transaction, namely, the water company.

The Government points out, however, that since the assessment revenue of the water company in the present case is commingled with non-shareholder revenue it is impossible to prove accurately that any of the assessment revenue was used to make capital expenditures. On the other hand, it is clear that the board of directors intended that the assessment revenue be used first to offset the operating deficit for the year (after there was first applied to the operating expenses for the year all revenue from nonshareholder sources), and then to make capital expenditures. Under the circumstances, an allocation should be and can be made.

The water company should be entitled to exclude from its gross income as capital contributions an amount that bears the same proportion to its total capital expenditures as its shareholder assessment income bears to the total of shareholder assessment income plus non-shareholder net income.

Putting it another way, since all income (shareholder assessment income plus non-shareholder net income) was used indiscriminately to make capital expenditures, the taxpayer should be permitted to exclude as capital contributions only that proportion of total capital expenditures that shareholder assessment income bears to total income (share-assessment income plus non-shareholder net income).

This allocation may be stated in the following mathematical equation:

$$\frac{\text{Shareholder Assessments}}{\text{Shldr Assmts} + \text{Non-Shldr Net Income}} = \frac{\text{Amount to be Excluded}}{\text{Capital Expenditures}}$$

Of course this equation can then be reduced and simplified to:

$$\frac{\text{Shareholder Assessments}}{\text{Shldr Assmts} + \text{Non-Shldr Net Income}} \times \frac{\text{Capital}}{\text{Expenditures}} = \frac{\text{Amount to be}}{\text{Excluded}}$$

Such an allocation implements the assumption that the actual capital expenditures made in any year are made proportionately from assessment revenue and non-shareholder net income. Such an assumption is more realistic under the circumstances than an assumption that—as the Government would have it —no part of the actual capital expenditures are made from assessment revenue.

The water company contends that the assessment revenue should be excluded from its gross income in its entirety, arguing that actual use of the assessment revenue is irrelevant to its status as capital contributions, the difference between a payment for services and a contribution to capital being the presence of lack of a *quid pro quo*. It is argued that when a payment for goods and services is made something is received in return, but when a contribution to capital is made, the capital investment of the contributor represented by stock is enhanced. The cases relied upon to establish such a proposition, however, fail to consider the peculiar nature of a mutual water company. Appeal of Harry E. Lutz, 2 B.T.A. 484 (1925); Paxton v. C. I. R., 7 B.T.A. 92, (1927); Sackstein v. C. I. R., 14 T.C. 566 (1950); Estate of C. L. Hayne v. C. I. R., 22 T.C. 113 (1954).

While, therefore, not entirely satisfactory either to the Government or to the taxpayer, the allocation formula the Court decrees in this case does do substantial justice to both parties and comes well within the theory and application of the respective authorities cited and relied upon.

Applying this allocation formula, and In accordance with the foregoing, which shall also constitute findings of fact and conclusions of law, the Court now makes its formal Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

### 1.

This is an action for recovery of income tax assessed against and collected from Bear Valley Mutual Water Company (hereinafter "water company") as follows:

| Taxable Period | Tax | Interest | Total |
|---|---|---|---|
| Fiscal Year Ending: | | | |
| October 31, 1958 | $11,064.15 | $2,151.29 | $13,215.44 |
| October 31, 1959 | 6,759.85 | 908.78 | 7,668.63 |
| October 31, 1960 | 10,205.86 | 759.71 | 10,965.57 |

The Complaint for Refund of Income Taxes was filed on November 3, 1964. The Answer was filed on February 3, 1965.

### 2.

Federal jurisdiction is invoked upon the ground that Robert A. Riddell, District Director of Internal Revenue, Los Angeles District, acting by and through his duly authorized delegates, assessed and collected income tax from the water company as indicated in paragraph 1 hereof, which the water company alleges was not due. Jurisdiction is conferred on this Court by 28 U.S.C.A. § 1340 and 28 U.S.C.A. § 1346(a) (1).

### 3.

Bear Valley Mutual Water Company was organized and incorporated under the laws of California on June 10, 1903. The original articles of incorporation provided:

"Second: That the purposes for which it is formed are:

\* \* \* \* \* \*

10. To distribute and deliver all water owned, held or controlled by

it to its stockholders only, without charge or rental, in proportion to their respective holdings of stock. * * * "

The original articles of incorporation remained in force from the date of incorporation to June 8, 1916, when they were amended to empower the water company to own stock of another corporation and to sell and lease its lands not needed in connection with the reservoir and water distribution system. No other changes were made.

As amended, the articles of incorporation remained in force from June 8, 1916 to November 12, 1923, when they were again amended to delete the provisions added by the prior amendment, to delete a provision empowering the water company to grant the use of its water to others for mechanical purposes, and to delete a provision requiring stockholder consent to leases and sales of land. No other changes were made.

As thus amended, the articles of incorporation remained in force from November 12, 1923 to December 7, 1931, when the third amended articles of incorporation which have been in force since that time without further change or modification were adopted. These third amended articles of incorporation provide:

"Second: that the purposes for which it is formed are:

To furnish, supply and distribute water at cost, to and for its stockholders, for domestic, irrigation and all other useful purposes, in proportion to the number of shares of such stock held by them respectively.

In carrying out said purposes, it shall have power, among other things:

* * * * * *

All of the foregoing purposes and powers are subject to the express limitation and condition that the corporation is not formed and does not exist with a view to pecuniary gain or profit to its shareholders, nor shall the corporation carry on the business of any public utility, nor accumulate funds for the purpose of pecuniary gain; and at all times the corporation shall conduct its business and operate its property as a non-profit co-operative corporation for the exclusive use and benefit of its shareholders and without any profit accruing to them from the business of the corporation.

* * * * * *

Eighth: Authority is expressly conferred upon the corporation to levy assessments upon and against all of the shares issued by the corporation; and the Board of Directors shall have power, by majority vote of its members, to levy assessments upon all the issued shares of the corporation, at such time, or times, and from time to time, and in such amounts, as shall to them appear necessary or expedient; (provided, the assessment levied at any particular time shall be for the same amount against each share then issued and outstanding); and each assessment shall be a lien upon the shares assessed, from the time of the adoption of the resolution levying such assessment until paid, and each shareholder shall be personally liable to the corporation for the amount of each assessment levied against the shares, standing upon the books of the corporation in the name of such shareholder at the time of the adoption of the resolution levying such assessment, which amount may be recovered from the shareholder by suit or personal action.

In event of non-payment of any assessment, the corporation may, at its option, either (a) sell and/or forfeit the shares against which the assessment was levied, in the manner now, or as may be hereafter provided by the laws of the State of California; or (b) by majority vote of its Board of Directors, collect the assessment by personal action and suit against the shareholder personally liable therefor."

4.

On August 2, 1905, Bear Valley Mutual Water Company contracted for the

purchase of the assets of New Bear Valley Irrigation Company from The Citizens Savings and Trust Company, who was then and had been for several preceding years in the process of foreclosing certain bonds and liens against the assets of said New Bear Valley Irrigation Company. The Citizens Savings and Trust Company offered to sell all of the assets of the New Bear Valley Irrigation Company as a unit and would not sell the assets upon any other basis.

On January 1, 1909, Bear Valley Mutual Water Company delivered $600,000 of its bonds to The Citizens Savings and Trust Company and received an instrument of title to the assets of New Bear Valley Irrigation Company.

### 5.

The purchased assets included approximately 5,440 acres of land, of which approximately 2,740 acres were located above the high water line of Big Bear Lake. Big Bear Lake is an integral part of the water rights and water system operated by the water company, but the land located above its high water mark never did, nor does it now, serve any useful purpose in connection with the water rights and water system.

The water supply of the water company consists of the water impounded in Big Bear Lake and the natural flow of the Santa Ana River diverted at the intake of its water distribution system nine miles northeast of the City of Redlands and certain wells located in the vicinity of the City of Redlands.

### 6.

From 1903 to the present, the water company has purchased land in addition to that acquired in 1909 from The Citizens Savings and Trust Company, as follows:

| Date | Common Name | Acreage | Purchase Price |
|------|-------------|---------|----------------|
| 1930 | Clark Ranch | 640 acres | $27,000 |
| 1947 | Hill Ranch | 640 acres | 3,100 |
| 1951 | Swing Sections | 1280 acres | 20,000 |
| 1955 | Gentry Land | 160 acres | 2,075 |

In addition, certain parcels of land were purchased which were destined to be submerged by the water impounded by the "new dam". The "new dam" was completed in 1912. These lands, aggregating to 500 acres, were acquired in 1909 and 1910 for a total purchase price of $15,250.

In 1946, the water company purchased 21 acres located five miles east of the City of San Bernardino. A well was completed shortly after the land was acquired. The purchase price of this land was $5,610.

In 1946, the water company purchased a ½ acre parcel adjacent to its main intake nine miles northeast of the City of Redlands for the purpose of drilling a well to develop additional sources of pumped water. The purchase price of this land was $250.

In 1952, the water company purchased 92 acres lying just north of the City of Redlands. A well was completed shortly after the land was acquired. The purchase price of this land was $4,070.

In 1958, the water company purchased a parcel of land at the corner of 6th and Olive Streets in the City of Redlands. An office building housing only the personnel of the water company was constructed on the parcel. The parcel measured 100 feet by 125. The office building was completed in April, 1959. The purchase price of this land was $26,000.

The water company still owns all of the land purchased by it from sources other than The Citizens Savings and Trust Company with only one exception, i. e., the State of California condemned approximately 1,440 acres (being the "Swing Sections" purchased in 1951 and

the "Gentry Land" purchased in 1955) for use in connection with the establishment of Heartbar State Park in 1966 and paid $400,000 therefor. The Complaint In Eminent Domain was filed January 19, 1965 and the Judgment In Condemnation was filed and entered December 20, 1965. The Judgment In Condemnation was entered pursuant to Stipulation. Possession of the property vested in the State of California on January 3, 1966. The water company received its check for the judgment amount on January 10, 1966.

None of the land purchased by the water company from sources other than The Citizens Savings and Trust Company has ever been leased or otherwise devoted to commercial purposes.

The water company has not purchased any land other than as indicated in this paragraph and that acquired from The Citizens Savings and Trust Company in 1909.

Bear Valley Development Company did not purchase any land at any time during its existence.

### 7.

The water company, becoming concerned that it might not be classified as a "mutual irrigation" company within the meaning of the Revenue Act of 1916 because of its receipt of revenue from sources other than its shareholders, conferred with officials of the Internal Revenue Service in Washington, D. C. It was agreed that if the income producing assets of the water company were transferred to a separate corporation the water company would be classified as a "mutual irrigation" company within the meaning of the Revenue Act of 1916, and, shortly thereafter, Bear Valley Development Company was incorporated for this purpose.

In 1917, the water company conveyed certain of its land, including all of the land above the high water line of Big Bear Lake, to Bear Valley Development Company in exchange for all of its capital stock. The land conveyed to Bear Valley Development Company was, and remained, subject to the lien of the bonded indebtedness of the water company, being approximately $709,000, and, the security instrument made no provision for release of any of the land from its lien prior to full satisfaction of the indebtedness.

The capital stock of Bear Valley Development Company was never distributed to the shareholders of the water company. Rather, the capital stock was held, initially, by the water company and, subsequently, by three trustees for the benefit of the shareholders of the water company.

From 1917 through December 31, 1943, being the period during which the land above the high water line of Big Bear Lake was owned by Bear Valley Development Company, the revenues of the water company consisted solely of amounts received from its shareholders in response to assessments levied with respect to the outstanding stock of the water company.

### 8.

During its existence from 1916 through 1943, Bear Valley Development Company attempted to derive revenue from the lands it owned.

It subdivided approximately 295 acres of the land above the high water line of Big Bear Lake into improved cabin sites and residential lots. The principal subdivisions were Gilner Point subdivision (40 acres), Gibraltar Tract (60 acres), North Shore Lodge Tract (10 acres), and Moon Camp Subdivision (15 acres). The work of subdivision included surveying, grading, installation of sewage, water and electrical connections, and paving. Approximately 306 lots were sold to members of the public. Most sales were made on an installment basis. Installment proceeds from a portion of these sales are reported on the income tax returns filed by the water company for the fiscal years involved herein.

Some parcels of land were leased. The lessees used the land principally for cabin sites, although some used the land for commercial purposes. No improvements were constructed by the water company. All leases were of raw land only.

## 9.

Bear Valley Development Company derived net income or net loss from its activities, and paid income tax with respect thereto, as follows:

| Fiscal Year Ending | Net Income | Net Loss | Income Tax |
|---|---|---|---|
| Oct. 31, 1917 | $ 350.69 | — | — |
| Oct. 31, 1918 | 895.49 | — | — |
| Oct. 31, 1919 | 994.23 | — | — |
| Oct. 31, 1920 | 6,107.46 | — | — |
| Oct. 31, 1921 | 1,251.51 | — | — |
| Oct. 31, 1922 | 4,528.42 | — | — |
| Oct. 31, 1923 | 8,616.48 | — | — |
| Oct. 31, 1924 | 13,344.47 | — | — |
| Oct. 31, 1925 | 18,563.75 | — | — |
| Oct. 31, 1926 | 15,644.40 | — | — |
| Oct. 31, 1927 | 15,422.48 | — | — |
| Oct. 31, 1928 | 10,208.20 | — | — |
| Oct. 31, 1929 | 3,802.65 | — | — |
| Oct. 31, 1930 | 1,225.89 | — | — |
| Oct. 31, 1931 | 1,697.02 | — | — |
| Oct. 31, 1932 | — | $3,384.66 | — |
| Oct. 31, 1933 | — | 8,271.79 | — |
| Oct. 31, 1934 | — | 2,500.80 | — |
| Oct. 31, 1935 | — | 3,255.50 | — |
| Oct. 31, 1936 | — | 4,670.20 | — |
| Oct. 31, 1937 | — | 1,862.33 | — |
| Oct. 31, 1938 | — | 33.31 | — |
| Oct. 31, 1939 | — | 124.43 | — |
| Oct. 31, 1940 | 13,571.39 | — | $1,976.70 |
| Oct. 31, 1941 | 15,631.81 | — | 2,568.98 |
| Oct. 31, 1942 | 11,074.85 | — | 2,596.49 |
| Oct. 31, 1943 | (not available) | — | — |

## 10.

On December 31, 1943, the water company merged with, and succeeded to all of the assets of, Bear Valley Development Company, including cash in the amount of $24,875.20 representing its accumulated and retained earnings.

Installment proceeds from some of the land sales made by Bear Valley Development Company during its existence are reported as income by the water company in the income tax returns filed for the fiscal years involved herein.

Following the merger, the water company continued all of the projects and activities begun by Bear Valley Development Company and continually attempted to derive revenue from the lands it had acquired as a result of the merger.

## 11.

In 1946 the water company subdivided and improved approximately fifty acres of the land located above the high water line of Big Bear Lake, i. e., Eagle Point No. 2 Subdivision. The work of subdivision included surveying, grading, installation of sewage, water and electrical connections, and paving. The lands were divided into approximately 137 lots and sold to numerous purchasers. Most of the sales were installment sales. Installment proceeds from a portion of these sales are reported in the income tax returns filed by the water company for

the fiscal years involved herein. All of the improved lots have been sold.

In 1961, the water company subdivided and improved approximately 56 acres of the land located above the high water line of Big Bear Lake, i. e., Eagle Point No. 3. These lands were divided into approximately 202 lots and sold to numerous purchasers. Most of the sales were installment sales. The work of subdivision included surveying, grading, installation of sewage, water and electrical connection, and paving. Installment proceeds from a portion of these sales are reported on the income tax returns filed by the water company for the fiscal years involved herein. Not all of the improved lots have been sold as yet.

The water company has not subdivided and improved any of its land other than as set forth in this paragraph. All work of subdivision has been performed in compliance with the statutes, rules and regulations of the State of California and the County of San Bernardino. Permits have been obtained from the Real Estate Commissioner from time to time to offer lots to the public for sale.

### 12.

For many years, the water company has employed Mr. Raymond Reynolds, a licensed real estate broker, to conduct its sales and leasing activity, including the administration and collection of the installment contracts. This occupies approximately two-thirds of his time. The remainder of his time is devoted to his real estate brokerage business.

All sales and leases are approved by the board of directors of the water company.

The president, secretary and general manager of the water company devote approximately one-third of their time to real estate matters, including the general supervision of the work of subdivision and the sales and leasing activity. As indicated, the sales and leasing activity is conducted by Raymond Reynolds, and the work of subdivision is actually accomplished by employees of contractors and subcontractors, not employees of the water company.

### 13.

In a number of separate transactions, the water company has sold approximately 360 acres of the land located above the high water line of Big Bear Lake (in addition to land subdivided and improved by it as previously set forth). A number of these sales were installment sales, and installment proceeds from a portion of these sales are reported on the income tax returns filed by the water company for the fiscal years involved herein.

### 14.

Of the approximately 2,740 acres of land located above the high water line of Big Bear Lake at the time of acquisition of all of the assets of New Bear Valley Irrigation Company, the water company still owns approximately 1,999 acres.

### 15.

Portions of the land above the high water line of Big Bear Lake are leased by the water company to numerous and various persons and entities. Some of the leases provide for a "fixed rental" and others a "percentage rental". The leased lands are used for commercial and residential purposes, and include much of the commercial property in Big Bear Lake City. The water company leases only raw land, and any improvements located upon the land are constructed by, and at the expense of, the lessees.

There was a "gravel lease" in effect during each of the three fiscal years involved with respect to a "wash" or "bed" of a water course near Redlands, California. The annual rental was the greater of $1,000 or a royalty to be computed upon the amount of gravel removed, but only the minimum rent of $1,000 has ever been paid. Lease rentals for the three fiscal years were the following:

*Fiscal Year Ending October 31, 1958:*

There were ninety-six (96) "fixed rental" leases in effect with respect to

128.81 acres of land. Approximately one-half of the lessees used the leased land for residential purposes and the other one-half of the lessees used the leased land for various commercial purposes. Total rentals were collected in the amount of $27,739.

There were approximately thirteen (13) "percentage rental" leases in effect with respect to 90 acres of land. The lessees used the leased land for various commercial purposes. Total rentals were collected in the amount of $7,749.

(These amounts are included in the figures reflected as income received from "rents" on the U.S. Corporation Income Tax Return (Form 1121) filed for the fiscal year ending October 31, 1958.)

*Fiscal Year Ending October 31, 1959:*

There were 114 "fixed rental" leases in effect with respect to 136 acres of land. Approximately one-half of the lessees used the leased land for various commercial purposes and the other one-half of the lessees used the leased land for residential purposes. Total rents were collected in the amount of $30,585.

There were 15 "percentage rental" leases in effect with respect to 92 acres of land. The lessees used the leased land for various commercial purposes. Total rents were collected in the amount of $5,800.

(These amounts are included in the figures reflected as income received from "rents" on the U.S. Corporation Income Tax Return (Form 1120) filed for the fiscal year ending October 31, 1959.)

*Fiscal Year Ending October 31, 1960:*

There were 112 "fixed rental" leases in effect with respect to 131 acres of land. Approximately one-half of the lessees used the leased land for residential purposes and the other one-half of the lessees used the leased land for various commercial purposes. Total rent-

als were collected in the amount of $28,888.

There were 20 "percentage rental" leases in effect with respect to 101 acres of land. The lessees used the leased land for various commercial purposes. Total rentals were collected in the amount of $9,635.

(These amounts are included in the figures reflected as income received from "rents" on the U.S. Corporation Income Tax Return (Form 1120) filed for the fiscal year ending October 31, 1960.)

16.

In order to have Big Bear Lake stocked with fish by the Department of Fish and Game at no expense, the water company was required to, and did, dedicate the surface of Big Bear Lake to public use in 1915.

Since prior to 1915, and continuing through the present time, there have been sixteen commercial boat landings in operation at Big Bear Lake. The operators own and rent boats to the public, launch boats, and sell and rent fishing equipment.

Initially, the commercial boat landing operators disputed the rights of the water company to charge a rental. By agreement, commencing in 1915 and continuing into 1947, each operator paid to the water company an annual charge of $25.

In 1947, the Sheriff of the County of San Bernardino required that a patrol system be established and maintained at Big Bear Lake. The commercial boat landing operators attempted to establish and maintain a patrol system upon a cooperative basis, but shortly thereafter requested the water company to assume that responsibility.

The water company assumed responsibility for establishing and maintaining the patrol system in 1947, and, the operators agreed to pay, at their option,

either $16 for each boat launched at their respective landings or 6 percent of their respective gross receipts.

The water company received from the sixteen commercial boat landing operators the following amounts:

| | |
|---|---|
| Fiscal Year Ending October 31, 1958: | $9,297.84 |
| Fiscal Year Ending October 31, 1959: | 4,739.00 |
| Fiscal Year Ending October 31, 1960: | 7,546.00 |

———◆———

(These amounts are included in the figures reflected as income received from "boat fees" on the U. S. Corporation Income Tax Return (Form 1120) filed for each of the fiscal years ending October 31, 1958, 1959 and 1960.)

17.

Every boat using Big Bear Lake is required to purchase a permit from the water company. The rates in effect during the fiscal years involved were as follows:

| | Property Owners | Non-Property Owners |
|---|---|---|
| Boats without motor | $ 4.00 | $ 8.00 |
| Boats with outboard motor | 8.00 | 16.00 |
| Inboard Power Boats | 20.00 | 30.00 |

———◆———

The permits are good for the entire year in which purchased.

Permits for a single day were available during the fiscal years involved as follows:

| | |
|---|---|
| Boats without motors and with outboard motors | $5.00 |
| Inboard power boats | 8.00 |

———◆———

Every holder of a permit is entitled to use without charge the launch facilities established and maintained by the water company.

The water company received from the sale of boat permits the following amounts:

| | |
|---|---|
| Fiscal Year Ending October 31, 1958: | $29,684.00 |
| Fiscal Year Ending October 31, 1959: | 41,116.89 |
| Fiscal Year Ending October 31, 1960: | 26,490.00 |

———◆———

(These amounts are included in the figures reflected as income received from "boat fees" on the U. S. Corporation Income Tax Return (Form 1120) filed for each of the fiscal years ending October 31, 1958, 1959 and 1960.)

The water company does not make a charge for swimming or fishing in Big Bear Lake because of its dedication to public use in 1915.

18.

The land in and around Big Bear Lake is forested.

During the years involved, and in many prior years, the water company allowed a timber operator, V. P. Pedersen,

to cut diseased and overmature trees and receive in payment thereof $5. per thousand board feet.

The water company received from the sale of timber the following:

Fiscal Year Ending October 31, 1958 $ 80.00
Fiscal Year Ending October 31, 1959 7,644.55*
Fiscal Year Ending October 31, 1960 1,500.00

*(This amount does not represent payment for trees cut during the year. Payment for trees cut during the year amounted to $2,-664.55. The remainder of the amount, $5,000, represented a "deposit" or "prepayment" to cover future cutting over a maximum period of five years. No contention is made that the reporting of the $7,644.55 in the year of actual receipt was improper.)

(These amounts are included in the figures reflected as income received from "timber proceeds" or "sale of timber" on the U.S. Corporation Income Tax Return (Form 1120) filed for each of the fiscal years ending October 31, 1958, 1959 and 1960.)

19.

The water company determines its income and files its income tax return according to the accrual method of accounting and upon a fiscal year basis, commencing November 1 and ending October 31 of the succeeding year.

20.

During the years involved, and as more fully set forth in the income tax returns filed and elsewhere herein, the revenue of the water company was derived from assessments levied with respect to its outstanding stock, assessment penalties, stock transfer fees, zanjero services, sales of topsoil, sales of real estate, boat fees, interest, sales of timber, repossession gains, and rents. Rental income included canal rentals, fixed and percentage lease rentals and house and pasture rentals.

21.

For the fiscal year commencing November 1, 1957, and ending October 31, 1958, the water company filed a U. S. Corporation Income Tax Return (Form 1120) reflecting adjusted gross income in the amount of $106,780.48, deductions in the amount of $165,778.81, and therefore, a net loss in the amount of $58,998.-33.

For the fiscal year commencing November 1, 1958, and ending October 31, 1959, the water company filed a U. S. Corporation Income Tax Return (Form 1120) reflecting adjusted gross income in the amount of $156,773.78, deductions in the amount of $231,624.72, and therefore, a net loss in the amount of $74,-850.94.

For the fiscal year commencing November 1, 1959, and ending October 31, 1960, the water company filed a U. S. Corporation Income Tax Return (Form 1120) reflecting adjusted gross income in the amount of $157,687.57, deductions in the amount of $216,440.62, and therefore, a net loss in the amount of $58,-753.05.

22.

During each of the three fiscal years involved herein, the water company had 83,527 shares of stock, of which 83,450 shares were issued and outstanding and 77 shares were held as treasury stock. The shares were and are owned by approximately 330 separate shareholders, were and are not appurtenant to the land served by the water company or to any other lands, and each shareholder was and is entitled to receive a certain amount of water per share as determined from time to time by the board of directors of the water company.

23.

Approximately thirty shareholders, owning approximately 3,000 shares in the aggregate of the water company, did not and do not own land within the serv-

ice area of the water company. These shareholders may "sell" the water to which they are entitled to other shareholders. Such sales are normally for money and are handled privately by the shareholders involved.

24.

During the fiscal years involved herein, the board of directors determined that the water would be delivered to the stockholders in the amounts and for the periods as follows:

### Fiscal Year Ending October 31, 1958:

| | Month | Entitlement Per Share (Day Inches) |
|---|---|---|
| 1957 | November | ¾ of .30 |
| | December | ¾ of .30 |
| 1958 | January | 1.0 |
| | February | 1.0 |
| | March | 1.0 |
| | April | 1.0 |
| | May | 1.0 |
| | June | 1.0 |
| | July | 1.0 |
| | August | .60 |
| | September | .60 |
| | October | .60 |

### Fiscal Year Ending October 31, 1959:

| | | |
|---|---|---|
| | November | .50 |
| | December | .50 |
| 1959 | January | .50 |
| | February | .50 |
| | March | .50 |
| | April | .50 |
| | May | .50 |
| | June | .50 |
| | July | .50 |
| | August | .50 |
| | September | .50 |
| | October | .40 |

### Fiscal Year Ending October 31, 1960:

| | | |
|---|---|---|
| | November | .40 |
| | December | .40 |
| 1960 | January | 1.0 |
| | February | 1.0 |
| | March | 1.0 |
| | April | .40 |
| | May | .40 |
| | June | .40 |
| | July | .40 |
| | August | .40 |
| | September | .40 |
| | October | .40 |

Although the shareholders were entitled to receive delivery of water in the amounts determined by the number of shares owned by them and the then prevailing entitlement per share, the full entitlement was sometimes not taken by the shareholders.

The water company did not deliver water to any shareholder in excess of the amount determined by the number of shares owned and the then prevailing entitlement per share.

The water company delivers the water to which a shareholder is entitled at any point in the distribution system designated by the shareholder. Sometimes, a shareholder will "sell" the water to which he is entitled to another shareholder and designate the irrigation system of the purchasing shareholder as the point of delivery of the water to which he is entitled.

The service area of the water company comprises approximately 10,000 acres located in the vicinity of Redlands, California.

The water company delivers only untreated irrigation water for agricultural purposes. A small number of shareholders use some of the water delivered to them for domestic purposes at their own risk.

The water company delivers water only to its shareholders in proportion to their respective stock ownership, or such additional entitlements as they may buy from other shareholders.

The water delivered to the shareholders is used as an integral part of their businesses, i. e., owning and cultivating citrus orchards, except that some shareholders are mutual water companies and, as such, use no water, but rather deliver the water to their respective shareholders for use as an integral part of their businesses, i. e., owning and cultivating citrus orchards.

25.

The water company delivered water to its shareholders during the fiscal years and in the amounts as follows:

Fiscal Year Ending October 31, 1958: 19,290 acre-feet
Fiscal Year Ending October 31, 1959: 15,220 acre-feet
Fiscal Year Ending October 31, 1960: 16,488 acre-feet

The water company has never reported the receipt of any revenue from the sale of water on any of its income tax returns, including those filed for the years involved.

26.

The shareholders receiving delivery of water were not obligated to pay any amount in excess of the ,amount determined by the board of directors of the water company for the water actually received by them.

At no time during the existence of the water company has its board of directors ever resolved to impose a charge for water delivered. The only amounts ever paid to the water company during its existence by the shareholders were in response to the assessments levied with respect to their shares from time to time.

27.

In addition to receiving water from the water company, many shareholders own and operate their own wells.

28.

From time to time the water company has augmented its water supply by purchasing water from well owners in its service area.

For the fiscal year ending October 31, 1958, the water company purchased only a small amount of water. The aggregate amount paid for the water was $2,323.40.

For the fiscal year ending October 31, 1959, the water company purchased 2,403 acre-feet from 15 different suppliers at prices varying from 50 to 70 cents per day-inch. The aggregate amount paid

for the water was $39,389.73, which is a cost of $16.39 per acre-foot.

For the fiscal year ending October 31, 1960, the water company purchased 1,741 acre-feet of water from 17 different suppliers at prices varying from 50 to 70 cents per day-inch. The aggregate amount paid for the water was $31,693.-10, which is a cost of $18.20 per acre-foot.

The purchased water was pumped into the delivery system of the water company and mingled with the water from its own system.

### 29.

During the fiscal years involved, and, assuming the water company could have lawfully offered to sell water for the highest price obtainable from anyone willing to purchase it, including its own shareholders, the water company could have sold the water for at least the fair market value (FMV) amounts as follows:

| Period | Water | Amount | Minimum FMV per acre-ft. |
|---|---|---|---|
| Fiscal Year Ending: | | | |
| Oct. 31, 1958 | 19,290 acre-feet | $90,852.47 | $4.71 |
| Oct. 31, 1959 | 15,220 acre-feet | 97,383.77 | 6.46 |
| Oct. 31, 1960 | 16,488 acre-feet | 92,676.04 | 5.62 |

(The foregoing statement is a stipulation of the parties and shall not be construed as an admission by the Government that the fair market value of the water delivered was not greater than as indicated, nor that it was not equal to or greater than the cost to the water company of producing, gathering, furnishing and distributing water to its shareholders.)

The water company was not obligated by its articles of incorporation, or otherwise, to charge its shareholders an amount equal to the fair market value of the water distributed to them.

Likewise, the water company was not obligated by its articles or incorporation, or otherwise, to charge its shareholders an amount sufficient to offset or defray the cost of producing, gathering, furnishing and distributing water to them.

To have charged its shareholders either an amount equal to the fair market value or cost of the water produced, gathered, furnished and distributed to them would have resulted in a profit in derogation of the articles of incorporation of the water company.

The water company is obligated by its articles of incorporation to produce, gather, furnish, and distribute water to its shareholders not at "actual cost" but "net cost".

### 30.

On April 25, 1958, the board of directors levied an assessment of $1.00 against each share of issued and outstanding stock. The assessment was levied without regard to the amount of water used, if any, with respect to each share. The assessment was paid in full and produced revenue of $83,450.00.

On April 19, 1959, the board of directors levied an assessment of 80 cents against each share of issued and outstanding stock. The assessment was levied without regard to the amount of water used, if any, with respect to each share. The assessment was paid in full and produced revenue of $66,760.00.

On April 15, 1960, the board of directors levied an assessment of $1.00 against each share of issued and outstanding stock. The assessment was levied without regard to the amount of water used, if any, with respect to each share. The assessment was paid in full and produced revenue of $83,450.00.

The proceeds of the assessments were not separately or specially accounted for

and were received by the water company free of any restrictions upon use.

The intention of the board of directors when levying each of the assessments as indicated was to provide revenue to offset the deficit in operating expenses for the year (after there was first applied to the operating expenses for the year all revenue from non-shareholder sources) and to make capital expenditures. A portion of each assessment levied was intended to be a contribution to the capital of the water company, and, a portion of each assessment levied was intended to be a charge for water produced, gathered, furnished and distributed to the shareholders.

The water company should be permitted to exclude as contributions to capital an amount from its gross income for each of the years determined by the following formula:

Shareholder Assessments divided by Total of
Shareholder Assessments plus Non-Shareholder
Net Income and multiplied by Capital
Expenditure equals Amount to be Excluded.

———◆———

The remaining balance of the assessment revenue should be included in gross income for each of the years involved.

The assessment revenue to be excluded and included from the gross income of the water company under this formula is as follows:

| Period | Excluded | Included |
|---|---|---|
| Fiscal Year Ending Oct. 31, 1958 | $12,750 | $70,000 |
| Fiscal Year Ending Oct. 31, 1959 | 33,180 | 33,580 |
| Fiscal Year Ending Oct. 31, 1960 | 15,950 | 67,500 |

———◆———

31.

The net income from non-shareholder sources was:

| Period | Net Income |
|---|---|
| Fiscal Year Ending Oct. 31, 1958 | $33,503.78 |
| Fiscal Year Ending Oct. 31, 1959 | 9,073.51 |
| Fiscal Year Ending Oct. 31, 1960 | 36,566.45 |

———◆———

32.

In past years, the water company has levied assessments with regard to its outstanding stock as follows:

| Date | | Assessment Number | Assessment Per Share |
|---|---|---|---|
| January | 1906 | 1 | $ .50 |
| April | 1907 | 2 | .10 |
| January | 1909 | 3 | .50 |
| May | 1909 | 4 | .40 |

| Date | | Assessment Number | Assessment Per Share |
|---|---|---|---|
| November | 1909 | 5 | .30 |
| April | 1910 | 6 | 1.00 |
| April | 1911 | 7 | 1.00 |
| March | 1912 | 8 | .75 |
| April | 1913 | 9 | .40 |
| January | 1914 | 10 | .75 |
| March | 1915 | 11 | .75 |
| April | 1916 | 12 | .85 |
| April | 1917 | 13 | .85 |
| December | 1917 | 14 | .50 |
| April | 1918 | 15 | .30 |
| November | 1918 | 16 | .50 |
| April | 1919 | 17 | .40 |
| January | 1920 | 18 | .50 |
| April | 1920 | 19 | .40 |
| October | 1920 | 20 | .50 |
| March | 1921 | 21 | .50 |
| December | 1921 | 22 | .50 |
| April | 1922 | 23 | .15 |
| January | 1923 | 24 | .50 |
| May | 1923 | 25 | .50 |
| December | 1923 | 26 | .50 |
| May | 1924 | 27 | .50 |
| January | 1925 | 28 | .50 |
| April | 1925 | 29 | .50 |
| January | 1926 | 30 | .50 |
| April | 1926 | 31 | .50 |
| December | 1926 | 32 | .50 |
| April | 1927 | 33 | .50 |
| January | 1928 | 34 | .50 |
| April | 1928 | 35 | .50 |
| December | 1928 | 36 | .50 |
| April | 1929 | 37 | .50 |
| December | 1929 | 38 | .50 |
| February | 1930 | 39 | .50 |
| December | 1930 | 40 | .50 |
| April | 1931 | 41 | .50 |
| December | 1931 | 42 | .60 |
| May | 1932 | 43 | .60 |
| December | 1932 | 44 | .60 |
| April | 1933 | 45 | .50 |
| December | 1933 | 46 | .50 |
| April | 1934 | 47 | .60 |
| December | 1934 | 48 | .50 |
| April | 1935 | 49 | .60 |
| December | 1935 | 50 | .50 |
| April | 1936 | 51 | .50 |
| December | 1936 | 52 | .50 |
| April | 1937 | 53 | .50 |
| December | 1937 | 54 | .50 |
| March | 1938 | 55 | .40 |

| Date | | Assessment Number | Assessment Per Share |
|------|------|------|------|
| December | 1938 | 56 | .40 |
| April | 1939 | 57 | .40 |
| December | 1939 | 58 | .40 |
| April | 1940 | 59 | .40 |
| January | 1941 | 60 | .40 |
| May | 1941 | 61 | .40 |
| January | 1942 | 62 | .40 |
| May | 1942 | 63 | .40 |
| April | 1943 | 64 | .80 |
| April | 1944 | 65 | .80 |
| April | 1945 | 66 | .80 |
| April | 1946 | 67 | .80 |
| April | 1947 | 68 | .80 |
| April | 1948 | 69 | .80 |
| April | 1949 | 70 | .60 |
| April | 1950 | 71 | .80 |
| April | 1951 | 72 | .80 |
| April | 1952 | 73 | .80 |
| April | 1953 | 74 | .80 |
| April | 1954 | 75 | .70 |
| April | 1955 | 76 | .70 |
| April | 1956 | 77 | .70 |
| April | 1957 | 78 | 1.00 |
| April | 1958 | 79 | 1.00 |
| March | 1959 | 80 | .80 |
| April | 1960 | 81 | 1.00 |
| September | 1961 | 82 | 1.00 |
| April | 1962 | 83 | 1.00 |
| April | 1963 | 84 | 1.00 |
| April | 1964 | 85 | .80 |
| April | 1965 | 86 | .50 |

The assessments have been levied with respect to all outstanding and issued shares and without regard to the amount of water actually used, if any, with respect to each share. The amounts received by the water company from its shareholders in payment of the assessments levied were not separately or specially accounted for and were received by the water company free of any restrictions upon use. The amounts received are treated in the same manner as funds received from other sources and together with funds received from other sources are indiscriminately applied to the expenses of the water company.

33.

In addition to its operating expenses, the water company made capital expenditures during the fiscal years involved for the purposes and in the amounts as follows:

| Period | Capital Improvements | Retirement of Indebtedness | Total |
|------|------|------|------|
| Fiscal Year Ending | | | |
| Oct. 31, 1958 | $ 5,929.68 | $11,940.00 | $17,869.68 |
| Oct. 31, 1959 | 21,800.04 | — | 21,800.04 |
| Oct. 31, 1960 | 5,432.14 | 17,550.66 | 22,982.80 |

**34.**

A substantial number of the shareholders and all of the directors claimed deductions for the amounts paid by them in response to the assessments levied with respect to their stock in computing their respective taxable incomes for federal income tax purposes in each of the years involved.

**35.**

The water company has never distributed any property of any kind to its shareholders by way of dividend or otherwise (except water in proportion to the number of shares owned by a shareholder).

**36.**

The expenses reflected on the income tax return filed by the water company for each of the fiscal years involved are deductible as ordinary and necessary expenses of conducting a business (except to the extent there exist uncontested audit adjustments not related to the issues involved in the present controversy).

**37.**

Until January, 1948, when its exemption was revoked, the water company was considered by the Internal Revenue Service to be exempt from taxation as a "mutual irrigation company" within the meaning of the predecessor provisions of Section 501(c) (12) of the Internal Revenue Code of 1954.

**38.**

By letter dated April 20, 1962, the Internal Revenue Service notified the water company that after examination of the returns, it proposed to increase taxable income to the amount of $31,854.14 (for fiscal year ending October 31, 1958); $22,532.83 (for fiscal year ending October 31, 1959); and $33,923.09 (for fiscal year ending October 31, 1960).

On May 4, 1962, the Internal Revenue assessed deficiencies in income tax for the fiscal years ending October 31, 1958 (in the amount of $13,215.44), October 31, 1959 ($7,668.63) and October 31, 1960 ($10,965.57), which were collected from an advance payment made by the water company on April 11, 1962 and a further payment on May 15, 1962, in the amount of $3,819.78.

On April 7, 1964, a Claim (Form 843) was filed with the Internal Revenue Service with respect to each of the fiscal years. More than six months elapsed without any action being taken by the Internal Revenue Service, and thereafter, the within Complaint for Refund of Income Taxes was filed against R. A. Riddell, District Director of Internal Revenue.

**39.**

Adjustments made in the course of audit which are not in dispute and should be included in the recomputation of tax for the fiscal years 1958, 1959 and 1960 include: (1) The item "lake expense" for fiscal year 1959 should be disallowed in the amount of $15,892.19 and in its place depreciation is allowable in the sum of $1,854.09 in the fiscal year 1959 and $2,807.62 in fiscal year 1960; (2) depreciation claimed on vehicles and boats in fiscal years 1958, 1959 and 1960 should be decreased in the amounts of $371.99 for fiscal year 1958, $648.18 for fiscal year 1959, and $585.16 for fiscal year 1960.

**40.**

The following Conclusions of Law, insofar as they may be deemed Findings of Fact, are so found by this Court to be true in all respects. From the foregoing facts, the Court concludes that:

## CONCLUSIONS OF LAW

### I

The water company was organized and has continuously operated as a non-profit mutual water company to furnish water to its shareholders at cost.

### II

The water company was not obligated by its articles of incorporation or otherwise to charge its shareholders either

(a) the fair market value or (b) the cost of the water produced, gathered, furnished and distributed to them during the fiscal years involved.

### III

The shareholders were not obligated to pay any amount for the water produced, gathered, furnished and distributed to them in excess of the amount determined by the board of directors to be due therefor.

### IV

The water company was entitled and obligated to pool its revenue and expenses from all sources in an effort to furnish water to its shareholders at the lowest possible cost.

### V

The water company was not organized and has not been operated pursuant to a plan or scheme of tax avoidance. Its organization and mode of operation is, and has been historically, that prevailing and accepted for a non-profit mutual water company.

### VI

The water company was not entitled to receive from its shareholders for the water produced, gathered, furnished and distributed to them any amount in excess of the amount determined by the board of directors to be due therefor.

### VII

The water company did not realize income in the fiscal years involved equal to the difference between either the fair market value or cost of the water produced, gathered, furnished and distributed to them and the amount actually received from them therefor.

### VIII

The expenses reflected in the income tax returns filed by the water company for each of the fiscal years involved are deductible as ordinary and necessary expenses of conducting a business (except to the extent there exist uncontested audit adjustments not related to the issues involved in the present controversy). There is no basis for disallowing as deductions an aggregate amount of unspecified expenses equal to the excess of the cost of producing, gathering, furnishing and distributing water to the shareholders over the revenue received from them therefor. Each item of expense must be examined and measured against the legal standard for deductibility.

### IX

The amounts received by the water company from its shareholders in payment of the assessments levied with respect to their shares are partially includible in income and partially excludable from income as follows:

| Period | Excluded | Included |
|---|---|---|
| Fiscal Year Ending Oct. 31, 1958 | $12,750 | $70,700 |
| Fiscal Year Ending Oct. 31, 1959 | 33,180 | 33,580 |
| Fiscal Year Ending Oct. 31, 1960 | 15,950 | 67,500 |

The amounts included in income constitute charges for water.

The amounts excluded from income constitute capital contributions.

amounts received by the water company from its shareholders in payment of the assessments levied with respect to their shares during the fiscal years involved.

### X

There is no basis for either including in or excluding from the income of the water company the entire aggregate

### XI

The water company has overpaid its income tax and is entitled to a refund of the overpayments, as follows:

| Period | Overpayment |
|---|---|
| Fiscal Year Ending October 31, 1958 | $8,889.07 |
| Fiscal Year Ending October 31, 1959 | 7,668.63 |
| Fiscal Year Ending October 31, 1960 | 9,041.43 |

## XII

Any Conclusions of Law deemed to be contained in the Findings of Fact are incorporated herein by reference.

Let judgment be entered accordingly.